Talasi B. Brooks (ISB # 9712)
Laurence (Laird) J. Lucas (ISB # 4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, Idaho 83701
(208) 342-7024
(208) 342-8286 (fax)
tbrooks@advocateswest.org
llucas@advocateswest.org

Kristin F. Ruether (ISB # 7914)
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise, ID 83701
(208) 440-1930 (phone)
(208) 475-4702 (fax)
kruether@westernwatersheds.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY, WILDEARTH GUARDIANS, and PREDATOR DEFENSE,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>USDA WILDLIFE SERVICES,<br><br>　　　　　Defendant. | No. 1:17-cv-206-BLW<br><br>**PLAINTIFFS' OPENING SUMMARY JUDGMENT BRIEF***  |

　　　* This Opening Brief comprises 35 pages of text, as permitted by the Case Management Order in this matter. ECF No. 11.

## TABLE OF CONTENTS

**INTRODUCTION**………………………………………………………………………1

**FACTUAL AND PROCEDURAL BACKGROUND**………………………………………2

    **Wildlife Services' Predator Control Actions in Idaho**…………………………………2

    **Wildlife Services' Refusal to Prepare an Idaho EIS**……..…………………………3

    **June 2015 Draft EA**………………………………………………………4

    **November 2016 Final EA and Decision/FONSI**……………………………………8

**ARGUMENT**………………………………………………………………9

**I.**    **WILDLIFE SERVICES VIOLATED NEPA BY NOT PREPARING AN EIS**……..9

    A.  NEPA's Requirements………………………………………………..9

    B.  The Uncertainty And Controversy Over Wildlife Services' Idaho Predator Control
        Actions Required An EIS……………………………………….........................11

    C.  Potential Cumulative Impacts Required An EIS………………………………15

    D.  Wildlife Services Improperly Segmented Its NEPA Analysis……………………17

    E.  Unique Characteristics of the Geographic Area And Threatened Violation
        Of Other Laws Required An EIS……………………………………………19

**II.**  **THE FINAL EA AND DECISION/FONSI FAILED TO TAKE THE 'HARD
      LOOK' THAT NEPA REQUIRES**…………………………………………20

    A.  NEPA's "Hard Look" Requirement Applies to EAs and FONSIs…………………21

    B.  The Final EA Failed to Describe Actions and Effects in Adequate Detail…………22

        1.  *Wildlife Services Failed to Establish An Adequate Environmental
            Baseline*………………………………………………………22

        2.  *Wildlife Services' Failure to Consider Site-Specific Information Precludes An
            Adequate Effects Analysis*………………………………………26

    C.  Wildlife Services Failed To Take A Hard Look At Concerns About Effects Raised
        By Agency Reviewers………………………………………………...30

     1.   *Use of Lead Shot*......................................................................................31

     2.   *Humaneness*..........................................................................................32

**III.**    **THE EXPANDED PREDATOR KILLING IS *ULTRA VIRES***..........................33

**CONCLUSION**.................................................................................................35

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Am. Rivers v. FERC*, 201 F.3d 1186 (9th Cir. 1999)...............................................22

*Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208 (9th Cir.1998).......12, 15, 21

*Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012)..............................10

*Comm. for Idaho's High Desert v. Collinge*, 148 F. Supp. 2d 1097 (D. Idaho 2001)...............4

*Comm. for Idaho's High Desert v. Collinge*, No. 1:02-cv-172-BLW (D. Idaho 2003), ECF No. 73.......................................................................................................................4

*Delaware Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304 (D.C. Cir. 2014)................17, 18

*Earth Island Inst. v. U.S. Forest Serv.,* 442 F.3d 1147 (9th Cir. 2006)..............................10

*Friends of Animals v. Clay*, No. 13-cv-7293(JG), 2014 WL 4966122 (E.D.N.Y. Oct. 3, 2014).......................................................................................................34, 35

*Gifford Pinchot Task Force v. Perez*, No. 03:13–cv–00810–HZ, 2014 WL 3019165 (D. Or. July 3, 2014)..............................................................................................................21

*Izaak Walton League of Am. v. Kimbell*, 516 F. Supp.2d 982 (D. Minn. 2007)...................19

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004).....................................................................................................10, 11, 27, 30

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, No. 2:05-CV-0299-MCE-PAN, 2006 WL 1991414 (E.D. Cal. July 14, 2006)........................................................................27

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976)..................................................17

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000).................................................21

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)……………………12

*Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002)…………………………21

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953 (9th Cir. 2005)…………………10

*Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998)……………...27, 29

*N. Plains Resource Council v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011)……10, 23, 24

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005)………………...11

*Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016)…………………………..11, 22

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)…………………………9, 10

*Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109 (D. Or. 2002)……………*passim*

*Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988)………………………………...12

*State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982)……………………………………………...26

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*, 608 F.3d 592 (9th Cir. 2010)..21

*W. N. Carolina All. v. N. Carolina Dep't of Transp.*, 312 F.Supp.2d 765 (E.D. N.C. 2003)……21

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013)………………………………...26

*W. Watersheds Project v. Bennett*, 392 F. Supp. 2d 1217 (D. Idaho 2005)……………………...17

*W. Watersheds Project v. Grimm*, No. 1:15-cv-040-EJL, 2018 WL 495671 (D. Idaho Jan. 4, 2018)…………………………………………………………………………………………….4

*W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008)………………30

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011)……………………*passim*

*W. Watersheds Project v. Rosenkrance*, No. 4:09-cv-298-EJL, 2011 WL 39651 (D. Idaho Jan. 5, 2011)……………………………………………………………………………………23, 24

*Wilderness Soc'y v. U.S. Forest Serv.*, 850 F.Supp.2d 1144 (D. Idaho 2012)…………………...11

*Wildlands v. Woodruff*, 151 F. Supp. 3d 1153 (W.D. Wash. 2015)………………………5, 12, 13

*Wilderness Watch v. Vilsack*, 229 F. Supp. 3d 1170 (D. Idaho 2017)…………………………19

**Statutes**

5 U.S.C. § 706(2)………………………………………………………………11, 34

7 U.S.C. § 8351………………………………………………………………………34

42 U.S.C. § 4332(C)………………………………………………………………..10

**Regulations**

40 C.F.R. § 1500.1(a)………………………………………………………………9

40 C.F.R. § 1500.1(b)………………………………………………………10, 22

40 C.F.R. § 1500.1(c)………………………………………………………………9

40 C.F.R. § 1501.4………………………………………………………………11

40 C.F.R. § 1502.9………………………………………………………………30

40 C.F.R. § 1502.9(b)……………………………………………………………10

40 C.F.R. § 1502.15……………………………………………………………..22

40 C.F.R. § 1508.7…………………………………………………………..10, 15

40 C.F.R. § 1508.9(a)……………………………………………………………21

40 C.F.R. § 1508.25…………………………………………………………...17

40 C.F.R. § 1508.27……………………………………………………………..11

40 C.F.R. § 1508.27(b)……………………………………………………….9, 11

40 C.F.R. § 1508.27(b)(10)………………………………………………………19

## INTRODUCTION

In 2016, Wildlife Services killed 3,860 coyotes in Idaho by gunning them down from the air and the ground, trapping them, poisoning them, and gassing them.  These deaths added to thousands of birds, foxes, mountain lions, bears and other animals that Wildlife Services kills in Idaho each year as part of its so-called "predator damage management" activities, undertaken at the behest of livestock producers.

Despite its extensive activities, Wildlife Services has never prepared an Environmental Impact Statement (EIS) disclosing the breadth and environmental impacts of its Idaho activities to the public, as the National Environmental Policy Act (NEPA) requires.  Instead, it operates under a disjointed array of less-comprehensive Environmental Assessments (EAs), which allows it to conceal and minimize the impacts of its wide-ranging program.

In November 2016, Wildlife Services continued this pattern of NEPA avoidance by approving a *Final Environmental Assessment for Predator Damage Management in Idaho* (Final EA) and associated Decision and Finding of No Significant Impact (Decision/FONSI).  Federal and state agency reviewers and the public lambasted Wildlife Service's "analysis" of its actions and their impacts as being vague, unscientific, and biased.  Yet Wildlife Services ignored that criticism, violating NEPA.  *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492-93 (9th Cir. 2011).

Moreover, the Final EA and Decision/FONSI not only continue Wildlife Services' indiscriminate aerial gunning and other wildlife killing in Idaho, but approve expanding Wildlife Services' activities to include poisoning ravens to supposedly benefit greater sage-grouse and killing other native species at the request of the Idaho Department of Fish and Game (IDFG).  This Court has twice before rejected Wildlife Services' attempts to kill sage-grouse predators

without adequate NEPA compliance, and it must do so again now for failing to take the "hard look" that NEPA requires.  The scientific uncertainty and controversy over Wildlife Service's Idaho predator control activities, their adverse cumulative impacts, and their potential violations of other federal laws all require analysis in a full EIS.

The Court should thus grant summary judgment to Plaintiffs, reverse and set aside the 2016 Final EA and Decision/FONSI, and remand with instructions for Wildlife Services to fully comply with NEPA by preparing a legally adequate EIS before proceeding with Idaho predator control actions.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### Wildlife Services' Predator Control Actions In Idaho.

For decades, Wildlife Services has conducted taxpayer-funded wildlife killing operations in Idaho, primarily "predator damage management" actions aimed at removing alleged threats to livestock. SOF ¶ 2.[2]  These wildlife killing actions include: (a) aerial shooting from fixed-wing aircraft and helicopters to kill coyotes, red foxes, and wolves; (b) using trained dogs to track, lure, and kill coyotes, black bears, and mountain lions; (c) gassing coyotes, skunks, and rodents in their dens; (d) using sodium cyanide M-44 devices to kill canines like coyotes; (d) using quick-kill or body-gripping traps to kill birds and animals, and foothold traps, leg snares, and neck snares to capture or kill animals, including coyotes, red foxes, mountain lions, beavers, and wolves; and (e) using poisons to kill birds and rodents.  *Id.*

---

[1] As provided in the Case Management Order (ECF No. 11), Plaintiffs will submit a remedies motion once the Court has ruled on the merits.

[2] Pursuant to Local Civil Rule 7.1(b)(1), Plaintiffs submit herewith a Separate Statement of Undisputed Facts ("SOF") which set forth the relevant facts in detail, with citations to the Administrative Record and other materials properly considered by the Court.

Wildlife Services' predator killing actions in Idaho particularly target coyotes.  SOF ¶ 8.

In 2016, Wildlife Services killed 3,860 coyotes in Idaho.  *Id*.  It shot 3,033 coyotes from aircraft

and an additional 435 on the ground.  *Id.*  It also trapped and killed 339 coyotes in foothold traps

and neck snares, and poisoned 53 with M-44s.  *Id*.

According to Wildlife Services, its wildlife control actions typically occur each year on

about 6.2 million acres (9,688 square miles), or about 11.6 percent of the lands in Idaho.  SOF ¶

3.  The agency's "predator damage management" activities occur on about 50 percent of these

lands.  *Id.*  Many of these occur on federal lands managed by BLM or the U.S. Forest Service.

*Id*.  They may recur on the same lands for several years in a row.  SOF ¶ 11.  Nevertheless,

Wildlife Services refuses to analyze the site-specific locations or impacts of its predator control

actions, instead evaluating them using statewide estimates and averages.  SOF ¶¶ 9-12.

Wildlife Services conducts its wildlife killing on public lands under the purported

authority of very general Memoranda of Understanding with the BLM and U.S. Forest Service.

SOF ¶ 5.  To provide site-specific authorization, Wildlife Services claims that it conducts annual

meetings and prepares "Annual Work Plans" (AWPs) with each BLM and Forest Service unit

every year.  SOF ¶ 6.  But these AWP meetings are "very informal and no members of the public

attend," and they do not involve any NEPA analysis.  *Id.* (citing AR 79256).  Moreover, often

these annual meetings do not occur and current AWPs are frequently not adopted prior to

Wildlife Services' operations.  SOF ¶ 7.

**Wildlife Services' Refusal To Prepare An Idaho EIS.**

Despite the scope and breadth of its wildlife killing in Idaho, Wildlife Services has never

prepared an EIS analyzing and disclosing to the public the environmental impacts associated

with its activities.  SOF ¶ 16.

Instead, Wildlife Services has, in the past, relied on a badly-outdated and generic Programmatic Nationwide EIS from 1994 plus a suite of piecemeal EAs or other NEPA analyses purporting to discuss impacts of various aspects of its Idaho wildlife-killing.  Ans. ¶ 61.  These include a 1996 "Central and Northern Idaho Predator Control" EA, followed in 2004 by a FONSI; a 1998 EA and FONSI for "Bird Damage Management in Idaho," followed by an Amendment and FONSI in 2003, and an additional Amendment and FONSI in 2006; a 2002 EA and FONSI for "Predator Damage Management in Southern Idaho," followed by a "five year update" in 2007 and another FONSI in 2008; a 2004 EA and FONSI for "Rodent Damage Management in Idaho"; and a 2011 EA and FONSI regarding Gray Wolf Damage Management in Idaho (2011 Wolf EA/FONSI).  SOF ¶ 17.[3]

In addition, Wildlife Services has proposed at least twice before to broaden its predator control actions by undertaking experimental raven killing to purportedly benefit greater sage-grouse – proposals that this Court held to be unlawful on NEPA grounds.  *See Comm. for Idaho's High Desert v. Collinge*, 148 F. Supp. 2d 1097 (D. Idaho 2001); *Comm. for Idaho's High Desert v. Collinge*, No. 1:02-cv-172-BLW (D. Idaho March 4, 2003), ECF No. 73 (Memorandum Decision); *see also* Ans. ¶ 64.

**June 2015 Draft EA.**

In June 2015, Wildlife Services took the latest step in its piecemeal NEPA approach by issuing for public comment a Draft *Environmental Assessment for Predator Damage and*

---

[3] The 2011 Wolf EA/FONSI is not before the Court in this action as Plaintiffs have separately challenged it. *W. Watersheds Project v. Grimm*, No. 1:15-cv-040-EJL, 2018 WL 495671 (D. Idaho Jan. 4, 2018). Senior Judge Lodge recently dismissed that action for lack of standing, citing Idaho's state wolf depredation funding and IDFG's wolf management authority to conclude Plaintiffs could not show redressability.  *Id*.  Plaintiffs are appealing that ruling – which has no applicability here in any event, as Idaho does not have the same funding to conduct other (non-wolf) predator control activities that Wildlife Services undertakes in Idaho.

*Conflict Management in Idaho* (Draft EA), attempting to analyze the impacts of its predator damage management activities in Idaho other than wolf control, rodent control, and some bird control.  SOF ¶ 19; *see also* AR 32152-53, 32115.

The June 2015 Draft EA discussed five alternatives, including the "preferred" alternative. Under that alternative Wildlife Services proposed to expand its existing predator control actions to include raven-poisoning to allegedly benefit sage-grouse plus other wildlife-killing at the request of IDFG to "protect" game species such as deer and pronghorn antelope. SOF ¶ 21. Notably – and unlike prior EAs – the Draft EA did not purport to tier to the 1994 Programmatic Nationwide EIS, which Wildlife Service recently conceded (through other litigation) is outdated and cannot be used further.[4]  Wildlife Services thus has <u>no</u> EIS coverage for its Idaho predator control activities.

Through the public comment process, Wildlife Services received overwhelmingly critical feedback on the 2015 Draft EA from Plaintiffs, other federal and state agencies, and the public. SOF ¶¶ 23-29.  In total, Wildlife Services received hundreds of public comments, the majority opposing the proposed action.  SOF ¶ 23.[5]

---

[4] *See* Stipulation of Dismissal, *WildEarth Guardians v. USDA APHIS*, No. 2:12-cv-716-MMD-PAL (D. Nev. Oct. 6, 2016), ECF No. 68.

[5] Plaintiffs submitted extensive comments on the Draft EA and numerous scientific articles to underscore the inadequacy of Wildlife Services' analysis and urge it to adopt non-lethal methods. *See* AR 543-5338, 32734-33651, 33654-35090, 36401-37155.  As documented further in the accompanying Marvel, Cole, Fahy, Schmidt, Greenwald, Vanek, and Nokes Declarations, Wildlife Services' actions harm Plaintiffs and their staff and members by killing coyotes and other wildlife in areas they frequent, including public lands in southern Idaho.  *Id.*  Similarly, Wildlife Services' NEPA violations – failing to disclose and consider its predator control actions and impacts in a scientifically rigorous analysis – have harmed Plaintiffs' procedural interests under NEPA.  *Id.*  Plaintiffs' declarations and their extensive participation in the Administrative Record confirm their Article III standing to bring this action.  *See WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154-57 (9th Cir. 2015); *Wildlands v. Woodruff*, 151 F. Supp. 3d 1153 (W.D. Wash 2015) (both holding that environmental plaintiffs had Article III standing to challenge Wildlife Services' NEPA violations).

Many agency commenters criticized Wildlife Service's one-sided and biased "analysis" in the Draft EA.  SOF ¶ 24.  As BLM wrote: "The document thus far does not read like a real analysis of the potential [Predator Damage Management] outside of lethal methods.  Instead, it sounds like a pre-decisional defense of lethal methods, and fails to consider the real benefits of alternative approaches."  *Id*.  IDFG's large carnivore coordinator echoed this sentiment, commenting that:

> This is a very complete look at the potential impacts of control actions <u>from one perspective</u> and builds a nice case for conducting [Predator Damage Management] in Idaho.  <u>It does not however provide an adequate perspective of enormous availability of literature and research that shows the ineffectiveness or neutral benefit of the actions</u>, thus bringing to question the objectivity of the EA.

*Id*. (quoting AR 32058 (emphasis added)).  The Forest Service likewise wrote: "There is a weakness in this document in that by portraying only one side of the issue, and cherry picking papers, it is assuming that there is not controversy."  *Id*.

Reviewers also lambasted Wildlife Services' assessment of its activities' ecological effects.  The Forest Service noted that "[t]he effectiveness and efficiency of predator control for actually limiting damage is quite controversial."  SOF ¶ 25.  BLM commented that "there is no guarantee that predator control will have the intended impact on prey populations."  *Id*.  In the Draft EA's trophic cascades section, the Forest Service commented:

> Idaho WS Impact on Biodiversity and Impact on Trop[h]ic Cascades seem to be written off in too broad and unsubstantiated way[s] thus dismissing the need to seriously consider if these issues warrant being considered in detail.  Ironically, these are some of the issues that are important for WS to address to better show how their activities are or are not affecting these processes.

*Id*.  Similarly, BLM stated:

> As it reads now, the document ignores years of research on the nature of complex predator/prey relationships.  How does predator control impact the stability of

prey species populations relative to their competitors?  How does predator control impact carrying capacity?  How does predator control impact cyclic vs. non-cyclic prey populations?   How does predator control affect the composition and abundance of other predator species or a guild of other prey species?

*Id*.  BLM added, "[t]his dismisses a large body of evidence that predator removal can have indirect effects on local ecological systems." *Id*.  The US Fish and Wildlife Service (FWS) expressed deep discomfort with the Draft EA's treatment of the environmental effects of using lead shot.  SOF ¶ 26.  Likewise, Plaintiffs rebuked the Draft EA's inaccurate assumptions, cursory treatment of the effects of Wildlife Services' activities on trophic cascades and other ecological processes, and Wildlife Services' failure to analyze in detail the effects of using lead shot.  *See* AR 33667-73.

Reviewers also repeatedly advised that Wildlife Services' proposal to kill ravens and other sage-grouse predators to benefit sage-grouse would not work.  BLM wrote that "[c]ontrolling raven populations without changing the factors that increase their populations is likely to be futile over the long-term."  AR 31295.  IDFG suggested removing reference to its own 2015 raven control study, admitting "[i]t is unlikely we will be able to demonstrate benefits to sage-grouse."  SOF ¶ 27 (quoting AR 32059).  Plaintiffs' comments explained that predator killing to benefit sage-grouse is unjustified and not supported by the relevant science.  *Id*.

Comments also reflected concern that Wildlife Services would not coordinate with federal land management agencies before conducting activities, or that its activities might violate the agencies' statutory management mandates.  The Forest Service asked whether there was potential work in wilderness, and whether agencies could refuse the use of pesticides on federal lands.  AR 31064, 31201, 31206.  BLM alerted Wildlife Services that it would violate their Memorandum of Understanding not to coordinate activities where restrictions would be necessary to comply with land use plans and sensitive species objectives.  AR 31437.  BLM also

reminded Wildlife Services that it manages newly-designated wilderness in Owyhee County and predator control there would need to be closely coordinated through the Boise District.  AR 31328.  Plaintiffs raised similar concerns and stated that failure to follow these mandates would violate laws like the Federal Land Policy and Management Act (FLPMA), the National Forest Management Act (NFMA), and the Wilderness Act, among others.  AR 33677-81.

The Draft EA's discussion on the humaneness of its methods also raised red flags with reviewers.  BLM recommended replacing the "outdated" citations to Schmidt (1989) and (1992) in the humaneness section, because "the discussion has changed over the last 25 years."  SOF ¶ 29 (quoting AR 31442).  The Forest Service commented: "In this section there needs to be discussion about following trap check times.  It has been an issue in the past."  *Id.* (quoting AR 31115).  IDFG raised this issue as well.  *Id.*  IDFG also recommended that the use of pan-tension devices to prevent trapping non-target animals near animal carcasses should be described in detail, "otherwise it'll just (continue to) be ignored."  *Id.*

In sum, reviewers—including multiple sister agencies—documented the scientific inadequacies and controversy of Wildlife Services' wildlife killing activities under the preferred alternative, and underscored they would have significant impacts on the environment that the Draft EA failed to weigh in adequate detail.

**November 2016 Final EA and Decision/FONSI.**

Wildlife Services released its Final EA and Decision/FONSI in late November 2016.  SOF ¶ 30; *see* AR 37156 (Final EA), 37630 (Decision/FONSI).  The Final EA and Decision/FONSI discussed and adopted the preferred alternative virtually unchanged from the Draft EA, and determined it would have no significant impact on the environment.  *Id.*  In one of a few minor modifications to the preferred alternative, Wildlife Services committed to stop using

M-44 cyanide devices on public lands in Idaho.  *Id*.  But a few months later, an M-44 set by Wildlife Services on public lands near a Pocatello residential neighborhood injured a fourteen-year old boy and killed his dog.  *Id*.

Because the Final EA and Decision/FONSI failed to address the many inadequacies of the Draft EA and avoided Wildlife Services' NEPA duty to prepare a full EIS, Plaintiffs promptly filed this action and now seek summary judgment reversing and remanding the Final EA and Decision/FONSI for reasons below.

## ARGUMENT

## I.   WILDLIFE SERVICES VIOLATED NEPA BY NOT PREPARING AN EIS.

Plaintiffs' Claim One alleges that Wildlife Services violated NEPA by refusing to prepare an EIS covering its Idaho activities.  *See* Compl. ¶¶ 121-24, ECF No. 1.  Plaintiffs are entitled to summary judgment on this claim because the 2016 Final EA and Decision/FONSI ignored scientific controversy and uncertainty, potential cumulative effects and related actions, and the potential for its activities to violate federal agencies' land management mandates or impact unique geographic areas, each of which required an EIS.  40 C.F.R. § 1508.27(b).

### A.   NEPA's Requirements.

NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  The NEPA process ensures that an agency carefully considers information concerning significant environmental impacts, and that the public may scrutinize the information and participate in the decision-making process.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  The process aims to "foster excellent action" by helping public officials understand environmental consequences and take actions that "protect, restore, and enhance the environment."  40 C.F.R. § 1500.1(c).

NEPA requires federal agencies to take a "hard look" at potential environmental consequences of proposed actions and alternatives.  *N. Plains Resource Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011).  This "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  *Methow Valley*, 490 U.S. at 349.  Taking the "hard look" NEPA requires includes "considering all foreseeable direct and indirect impacts." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012).  It also requires addressing cumulative impacts. 40 C.F.R. § 1508.7; *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004).  This "hard look" "should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *Earth Island Inst. v. U.S. Forest Serv.,* 442 F.3d 1147, 1159-60 (9th Cir. 2006).

Agencies must ensure the professional integrity, including the scientific integrity of discussions and analyses in NEPA documents, and may not rely on incorrect assumptions or data to achieve the required hard look.  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005).  NEPA analyses must use "high quality" environmental information.  40 C.F.R. § 1500.1(b).  "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id*.  An agency must "discuss . . . any responsible opposing view . . . [and] indicate the agency's response to the issues raised."  40 C.F.R. § 1502.9(b); *see Kraayenbrink*, 632 F.3d at 492-93.

To this end, NEPA requires a federal agency to prepare an EIS for any major federal action significantly affecting the human environment.  42 U.S.C. § 4332(C).  The Council on Environmental Quality's (CEQ) regulations implementing NEPA provide that an agency may prepare a shorter Environmental Assessment (EA) to determine whether an EIS is necessary.  40

C.F.R. § 1501.4; *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993.  "An EIS an EIS must be prepared if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor.  To trigger this requirement a plaintiff need not show that significant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient."  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) (internal quotations, citations, and alterations omitted).

Significance is determined by "context" and "intensity."  40 C.F.R. § 1508.27.  Intensity turns on ten factors, including impacts that "are likely to be highly controversial" or are "highly uncertain," potential cumulatively significant impacts, impacts to unique geographic areas, and threatened violation of other laws.  *Id.* § 1508.27(b).  The presence of any one factor may be sufficient to require an EIS.  *Ocean Advocates*, 402 F.3d at 865.  "If the reasons for a finding of no significant impact are arbitrary and capricious and the complete administrative record demonstrates that the project may have significant impact on the environment, ordering the preparation of an EIS is appropriate."  *Wilderness Soc'y v. U.S. Forest Serv.*, 850 F.Supp.2d 1144, 1155 (D. Idaho 2012).

NEPA violations are reviewed under the Administrative Procedure Act (APA), which directs the reviewing court to hold unlawful and set aside agency conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2); *Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) ("*ONDA*").  "An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant." *Blue*

*Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir.1998) (internal

quotation omitted).

> **B.      The Uncertainty And Controversy Over Wildlife Services' Idaho Predator
>           Control Actions Required An EIS.**

"An action is 'highly controversial' if there is 'a substantial dispute [about] the size,

nature, or effect of the major Federal action rather than the existence of opposition to a use.'"

*Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988).  Public comments may

raise substantial questions about the size, nature, and effect of the action, triggering the

requirement for an EIS due to high controversy.  *Id.*  An agency must also prepare an EIS where

the effects of a proposed action are highly uncertain:

> Preparation of an EIS is mandated where uncertainty may be resolved by further
> collection of data . . . or where the collection of such data may prevent speculation
> on potential effects.  The purpose of an EIS is to obviate the need for speculation
> by insuring that available data are gathered and analyzed prior to the
> implementation of the proposed action.

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 732 (9th Cir. 2001).

In *Wildlands v. Woodruff*, 151 F. Supp. 3d 1153, 1165 (W.D. Wash. 2015), the court

applied these factors in finding that Wildlife Services' proposed wolf killing in the State of

Washington was highly controversial, because there was significant disagreement among experts

about whether wolf control actually reduces livestock depredations. Similarly, in *Sierra Club v.*

*U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109, 1134 (D. Or. 2002) ("*Sierra Club*"), the

District of Oregon found that impacts associated with an elk predation study were highly

controversial where the agency failed to adequately respond to concerns from numerous

commenters that it did not know what the cougar population of the project area was and could

not accurately gauge the study's effects on the environment.  And, as the Ninth Circuit held in

affirming this Court's ruling on BLM grazing regulation revisions, critical feedback from other

agency expert reviewers underscores the potentially significant impacts of a proposed action, requiring the action agency to respond to those comments "objectively and good faith," or make changes to the proposed action. *Kraayenbrink*, 632 F.3d at 492-93.

This case is similar to *Woodruff*, *Sierra Club*, and *Kraayenbrink*. Expert agency reviewers told Wildlife Services point-blank that the environmental effects of its wildlife-killing were highly controversial, but Wildlife Services dismissed that feedback without making changes to the proposed action or conclusions in response. SOF ¶¶ 25, 30. The Forest Service expressly advised that the "effectiveness and efficiency of predator control for actually limiting damage is quite controversial. There are lots of scientific and other documents indicating it." *Id.* ¶ 25. BLM echoed the same points. *Id.* IDFG directed Wildlife Services to a 2011 Idaho-based study, Hurley *et al.* (2011), which found a five-year effort to enhance mule deer populations by reducing coyote and mountain lion populations so ineffective that IDFG abandoned it. AR 32058. BLM pointed out that killing ravens was unlikely to boost sage-grouse numbers without tackling the root causes of population declines, and IDFG admitted that its own raven control study was unlikely to demonstrate benefits to sage-grouse. AR 31295, 79417.

Rather than responding to this extensive negative feedback "objectively and in good faith" or making responsive changes to the proposed action, as required by NEPA and *Kraayenbrink*, Wildlife Services dismissed the opposing science as inapplicable and disclaimed responsibility for management choices. *E.g.*, AR 37497-98 (Final EA, dismissing opposing science). It claimed that its activities would not exacerbate coyote depredations because removal of territorial individuals would result in emigration of individuals less likely to prey on livestock, even though science it cited elsewhere explained that removals could create vacancies for breeding coyotes more likely to prey on sheep. *Contrast* AR 37308-09 *with* AR 37172. It

responded to the Hurley *et al.* (2011) study by stating "removals for deer population enhancement are not anticipated," while admitting that such removals could nevertheless occur "[i]f a natural resource management agency requests assistance in protecting wildlife species." AR 37184; *see also* AR 37266. Similarly, in response to evidence that killing ravens may not work to boost sage-grouse populations, the Final EA mentioned IDFG's failed raven-killing experiment without addressing its results – but then said that it would help IDFG with future raven-killing under the preferred alternative if requested, and had a request pending to do so. AR 37184-86, 37242; *see* AR 37195 (request pending).

Wildlife Services also failed to adequately respond to controversy concerning the potential of its actions to cause ecological impacts such as disruptions to trophic cascades, meso-predator release, exacerbating depredations by changing coyote pack structure, or other environmental consequences. SOF ¶¶ 24-25, 27. Instead, Wildlife Services simply repeated the same rationale that the agency reviewers critiqued in the Draft EA, contending that such impacts would not occur because it did not seek to eradicate coyote populations, and conducts operations only in "localized" areas for limited periods of each year. *Compare* AR 37381-89 (Final EA) *with* AR 32170-71 (Draft EA, discussing trophic cascades). None of these representations are accurate. Actually, Wildlife Services kills an average of over 3,000 coyotes a year in Idaho, across the 9,688 square miles on which it operates. SOF ¶ 12. These activities may persist for up to 180 days, a period which BLM commented "is half the year, so not a short period." AR 31341 (BLM comments), 37381 (Final EA). In some local areas, the activities may "be conducted annually for a period of several years." AR 31341 (BLM comments), 37305 (Final EA). Like in *Sierra Club*, Wildlife Services' explanation for why its activities will not

significantly impact biodiversity or the environment is "unconvincing."  *Sierra Club*, 235 F.

Supp. 2d at 1134; *see also Blackwood,* 161 F.3d at 1211.

The Final EA's analysis thus failed to address the controversy over likely effects of

Wildlife Services' proposed wildlife killing actions.  The disconnect between the facts in the

Administrative Record concerning the ineffectiveness of Wildlife Services' potential activities,

and the decision to nevertheless proceed with them if requested by IDFG, underscores that a full

EIS was required here.

### C.   Potential Cumulative Impacts Required An EIS.

A cumulative impact is an "impact on the environment which results from the

incremental impact of the action when added to . . . reasonably foreseeable future actions . . . ."

40 C.F.R. § 1508.7.  In *Sierra Club*, the District of Oregon held that cumulative impacts

warranted an EIS under similar facts.  235 F. Supp. 2d at 1129-32.  There, the Oregon

Department of Fish & Wildlife (ODFW) proposed killing mountain lions in two Wildlife

Management Units (WMUs) as part of an elk predation study.  *Id*. at 1119.  The EA disclosed

that the cougar population of one of the WMUs was unknown, and ODFW's cumulative effects

analysis did not consider whether additional cougar mortality from hunting and animal damage

control would cause greater than the 50 percent mortality level ODFW believed the population

could withstand.  *Id*. at 1130-31.  The court held that where the agency did not know how many

cougars inhabited one of the WMUs, and the agency failed to consider how lawful killing could

combine with the study removals to impact the population, removals in excess of 50 percent

were possible and could cause a significant effect on the human environment.  *Id*.

The facts here are even more egregious because Wildlife Services made no effort to

estimate how many coyotes (or other predators) inhabit any area where it conducts work and its

cumulative effects analysis analyzes effects only at the statewide scale when its operations are actually restricted to limited areas.  SOF ¶¶ 9, 11.  To address cumulative effects on coyote populations, Wildlife Services estimated that there were 0.6 coyotes per square mile across the entire state of Idaho, or 50,134 coyotes statewide.  SOF ¶ 11.  It then assumed that coyotes can withstand removals of 60 percent of the population and still maintain a viable population.  *Id*.  Next it assumed, based on data from 2011-2014, that if Wildlife Services killed a maximum of 6,000 coyotes in a single year, the total coyote mortality including from hunting and trapping would be approximately 10,186 coyotes, or 20.3 percent of the statewide coyote population, which it considered insignificant.  *Id*.

This is misleading because Wildlife Services does not conduct its activities statewide – it conducts activities on approximately 11.6 percent of the state, or less, each year.  SOF ¶ 3. The coyote population of this area, estimated using Wildlife Services' methods, is approximately 5,813.  SOF ¶ 12.  If the maximum annual coyote mortality of 10,186 animals occurred, it would wipe out almost twice the 5,813 coyotes that inhabit the affected area.  *Id.*  Wildlife Services could completely eradicate coyotes in the area where it operates, but it did not consider that potential effect because it does not consider impacts to local coyote populations.  SOF ¶¶ 11, 15.

As the Final EA acknowledges, coyote killing at this level can cause impacts to trophic cascades, biodiversity, and coyote pack structure and breeding habits.  SOF ¶¶ 13-14.

> The loss of apex predators from an ecosystem reduces biodiversity and … may alter the presence and abundance of mesopredators, increase the intensity of herbivory, or cause shifts in herbivore and small prey populations impacted by mesopredators, and ultimately impact the abundance and composition of plant communities, soil structure, nutrients and even physical characteristics of the environment.

SOF ¶ 13 (quoting AR 37381).  Coyotes respond to removals with compensatory reproduction, such as increased litter sizes, and younger members of the pack breeding.  *E.g.*, AR 48992 (Gese

(2005)), AR 37308 (Final EA, discussing food regulating coyote pack size).  Thus, Wildlife

Services' dismissal of the possibility that its activities' cumulative impacts may include

ecological effects associated with long-term, intensive coyote removals is unsupported.  *See* AR

37380-87 (EA dismissing potential effects).  These impacts may be significant and warrant

preparation of an EIS.

> **D.  Wildlife Services Improperly Segmented Its NEPA Analysis.**

By dividing its consideration of its Idaho activities' impacts between a smorgasbord of

EAs, Wildlife Services has improperly segmented its NEPA analysis, again precluding it from

fully considering its activities' cumulative effects.  This improper segmentation violated NEPA.

*See W. Watersheds Project v. Bennett*, 392 F. Supp. 2d 1217, 1223-24 (D. Idaho 2005) (holding

BLM violated NEPA by segmenting analysis into multiple EAs that failed to address cumulative

impacts, and requiring EIS).

When proposals for several actions that "will have cumulative or synergistic

environmental impact upon a region are pending concurrently before an agency, their

environmental consequences must be considered together."  *Kleppe v. Sierra Club*, 427 U.S. 390,

410 (1976).  "[W]hen determining the contents of an EA or EIS, an agency must consider all

'connected actions,' 'cumulative actions,' or 'similar actions.'"  *Delaware Riverkeeper Network

v. F.E.R.C.*, 753 F.3d 1304, 1314 (D.C. Cir. 2014).  Relevant here, "cumulative actions" are

actions "which when viewed with other proposed actions have cumulatively significant impacts,"

and "similar actions" are actions "which when viewed with other reasonably foreseeable or

proposed agency actions, have similarities that provide a basis for evaluating their environmental

consequences together, such as common timing or geography."  40 C.F.R. § 1508.25.  A

meaningful cumulative impact analysis must include past, present, and reasonably foreseeable

future actions that have had or are expected to have impacts in the same area. *Delaware Riverkeeper*, 753 F.3d at 1319.

The activities Wildlife Services conducts under its Bird, Rodent, and Wolf EAs may occur throughout Idaho, including in the same areas of the state where Wildlife Services conducts "predator damage management" activities under the Final EA at issue here, and their cumulative effects should have been considered in a single EIS. *See* AR 62104-97 (Bird EA), 62408-62518 (Rodent EA), 62751-62894 (Wolf EA). Wildlife Services claims in the Final EA that the nature of the damage to be addressed, methods to be used, and/or ecological role of the species involved are sufficiently different that consideration in separate EAs is appropriate. AR 37258. However, the activities are generally intended to benefit agricultural producers, controls are accomplished by means of the same poisons, traps, firearms, and other means, and the effects of the removals contemplated under the other EAs with the ones at issue here may have cumulative or synergistic effects that Wildlife Services ignored in the Final EA here.

For example, Wildlife Services never analyzed the impacts of the wolf-killing it conducts under its separate Wolf EA in conjunction with the coyote-killing authorized here. *See* SOF ¶ 19. The cumulative impacts of removing wolves and coyotes from the same areas have potential cumulative ecological impacts that are worth considering:

> The loss of apex predators from an ecosystem reduces biodiversity and shortens the food web length in the system which may alter the presence and abundance of mesopredators, increase the intensity of herbivory, or cause sifts in herbivore and small prey populations impacted by mesopredators, and ultimately impact the abundance and composition of plant communities, soil structure, nutrients and even physical characteristics of the environment.

SOF ¶ 13 (quoting Final EA). One study measured that coyote predation on antelope was 34 percent lower in sites with wolves, and another found recovery of wolf populations increased survivorship of pronghorn deer fawns. AR 37384. Restoration of wolves and consequent

suppression of the coyote population also increased the number of voles within three kilometers

of wolf dens.  AR 37386.  Presence of healthy wolf populations might decrease the need for

Wildlife Services' activities targeting coyotes, suppressing wolf populations might increase the

need for those activities, and depressing populations of both predators might have synergistic

impacts on the environment that Wildlife Services never considered because it improperly

segmented its NEPA analysis.  These potential interactive and cumulative impacts from similar

predator control actions thus required a "hard look" in an EIS.

### E.  Unique Characteristics of the Geographic Area And Threatened Violation Of Other Laws Required An EIS.

Wildlife Services must also prepare an EIS because its proposed activities threaten

violation of other laws enacted to protect the environment.  40 C.F.R. § 1508.27(b)(10).  For

example, Wildernesses are unique geographic areas, and impacts to their wilderness character

may cause violations of the Wilderness Act, or at least meet the NEPA significance criteria.  *See*

*Wilderness Watch v. Vilsack*, 229 F. Supp. 3d 1170, 1180-81(D. Idaho 2017) (holding wildlife

collaring project within Frank Church-River of No Return Wilderness triggered this EIS factor);

*Izaak Walton League of America v. Kimbell*, 516 F. Supp.2d 982, 996-97 (D. Minn. 2007).

Wildlife Services claims to coordinate with federal land management agencies to ensure

its activities do not run afoul of mandates governing management of federal lands during its

AWP meetings.  SOF ¶ 6.  The Final EA asserts Wildlife Services will consult with the

appropriate land management agency to ensure activities in Wilderness comply with the

Wilderness Act, without identifying what form these consultations may take, or whether the

public will be involved.  AR 37320.  Wildlife Services also claims that the level of control

activities it conducts in protected areas like Wilderness and Wilderness Study Areas (WSAs) is

so minor that the effects of the preferred alternative "would not likely be significantly different from the effects of a 'No Control in Wilderness Areas' alternative."  AR 37272.

But the record before the Court belies these claims.  First, the AWP meetings are extremely informal and often do not occur.  SOF ¶¶ 6-7.  Second, Wildlife Services has conducted control actions in WSAs in the past, AR 75043, 75039, and considers it highly likely it will conduct work in other Wildernesses, WSAs, and Areas of Critical Environmental Concern in the future, including the newly-designated Boulder-White Clouds Wilderness, AR 37586-89.  There is no evidence beyond bald assertions that Wildlife Services has ensured these past and projected activities comply with federal land management agencies' mandates for managing these special places.  *See id.* (three-page chart), AR 37230 (discussion of consultation), SOF ¶¶ 6-7.  Indeed, Wildlife Services may conduct activities without being aware that new management requirements apply to lands recently designated as wilderness, for example.  *See* AR 31328 (BLM reminding Wildlife Services of the newly-designated Owyhee Wilderness on Boise District BLM lands).  The Record contradicts Wildlife Services' breezy assurances that it will comply with other laws through its AWPs, showing potential for violation of other laws and impacts to unique geographic areas, again warranting an EIS.

## II.  THE FINAL EA AND DECISION/FONSI FAILED TO TAKE THE 'HARD LOOK' THAT NEPA REQUIRES.

Wildlife Services also violated NEPA by failing to take a "hard look" at the environmental effects of its actions in the Final EA and Decision/FONSI.  *See* Compl. ¶¶ 125-29 (Claim Two).  Plaintiffs are entitled to summary judgment on this claim because, by describing its actions only in general terms in the Final EA and Decision/FONSI, Wildlife Services failed to establish a meaningful environmental baseline against which to gauge the effects of its actions.  By refusing to consider its actions in site-specific detail, Wildlife Services again failed to take

the required "hard look."  It also did not adequately respond to feedback from agency reviewers

that its use of lead shot merited further review because it could harm eagles and that its

discussion of the humaneness of its methods was outdated.

A.     **NEPA's "Hard Look" Requirement Applies to EAs and FONSIs.**

NEPA allows an agency to prepare an EA instead of an EIS "[a]s a preliminary step . . .

to decide whether the environmental impact of a proposed action is significant enough to warrant

preparation of an EIS." *Blackwood*, 161 F.3d at 1212 (citing 40 C.F.R. § 1508.9(a)).  An EA

must "provide sufficient evidence and analysis for determining whether to prepare an

environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).

This includes a discussion of cumulative impacts.  *Native Ecosystems Council v. Dombeck*, 304

F.3d 886, 895-896 (9th Cir. 2002).

"Because the very important decision whether to prepare an EIS is based solely on the

EA, the EA is fundamental to the decision-making process."  *Metcalf v. Daley*, 214 F.3d 1135,

1143 (9th Cir. 2000).  The decision to forego preparation of an EIS cannot stand if the EA failed

to take the required hard look.  *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*,

608 F.3d 592, 603-07 (9th Cir. 2010).  "[I]f the EA is deficient under NEPA … then the

[agency's] DN/FONSI is necessarily arbitrary and capricious because it relied on the…EA."

*Gifford Pinchot Task Force v. Perez*, No. 03:13–cv–00810–HZ, 2014 WL 3019165, at *40 (D.

Or. July 3, 2014).  "If an EA does not reasonably compile adequate information and sets forth

statements that are materially false or inaccurate the Court may find that the document does not

satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation

or a reasoned decision."  *W. N. Carolina All. v. N. Carolina Dep't of Transp.*, 312 F.Supp.2d

765, 776-77 (E.D. N.C. 2003) (internal quotations and citations omitted).

**B.      The Final EA Failed to Describe Actions and Effects in Adequate Detail.**

The Final EA and Decision/FONSI fail the NEPA "hard look" requirement because Wildlife Services did not describe the proposed actions in sufficient detail to identify the existing environment that may be impacted.  By omitting any specifics about the locations, methods, timing or other details of its proposed Idaho predator killing, the Final EA and Decision/FONSI purport to broadly authorize Wildlife Services to kill any predators, for any reason, anywhere in the state.  Wildlife Services proposes to gather the information regarding the effects of these activities through implementing the actions it purports to justify through the Final EA, without any additional public environmental analysis.  *See* AR 37184 (describing experimental predator-killing projects).  This "shoot first, ask questions later" approach violates NEPA.

> 1.      *Wildlife Services Failed to Establish An Adequate Environmental Baseline.*

 "The establishment of a 'baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action.'"  *ONDA*, 840 F.3d at 568 (quoting *Am. Rivers v. FERC*, 201 F.3d 1186, 1195, n.15 (9th Cir. 1999)).  "An EIS must 'succinctly describe the environment of the area(s) to be affected . . . by the alternatives under consideration,' and 'insure that environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken.'"  *Id*. (quoting 40 C.F.R. §§ 1502.15, 1500.1(b)) (emphasis original) (internal citations omitted).

An agency must assess, "in some reasonable way," actual baseline conditions necessary to assess effects identified as significant environmental concerns.  *Id*. at 569.  In *ONDA*, the Ninth Circuit held that where sage-grouse were identified as a significant concern, and the action agency did not report on any observations of the project area surveying winter sage-grouse use of

the area, the agency failed to comply with the baseline requirement. *Id*. at 569-71. Instead, in that case, the agency relied on the assumption that sage-grouse would not use the area in winter based on data from other locations, even though data showed sage-grouse actually used one of the locations, in winter. *Id*. at 569. This rendered the FEIS arbitrary and capricious. *Id*. at 570.

An agency may not defer collecting information about possible effects until after a project is implemented. In *N. Plains*, the Ninth Circuit held that relying on future studies to establish baseline conditions for purposes of gauging a project's impacts on affected fish and wildlife species violated the agency's obligation under NEPA to "understand the adverse environment effects *ab initio*." 668 F.3d at 1085. Likewise, in *Sierra Club*, the court rejected the state wildlife management agency's proposal to collect missing data regarding predator density by conducting the predation management study at issue there, where adverse environmental effects were possible. 235 F. Supp. 2d at 1133-34. In *W. Watersheds Project v. Rosenkrance*, Judge Lodge rejected an agency's proposal to rely on future rangeland health assessments to mitigate potential cumulative effects, holding that "quantified or detailed information" is necessary for an adequate cumulative effects analysis. No. 4:09-cv-298-EJL, 2011 WL 39651, at *12 (D. Idaho Jan. 5, 2011).

Here, Wildlife Services not only intends to determine the effects of its activities <u>after</u> it has implemented them, but it also plans to determine what the activities will be and where they will take place later, without any public disclosure or further NEPA analysis. Wildlife Services describes the activities to be implemented only in extraordinarily vague terms:

> Some of the new [predator damage management] projects that WS-Idaho might
> be requested to assist with are discussed below. However, this is not a
> comprehensive list, natural resource management agencies could request WS-
> Idaho assistance with all, a subset or none of the projects listed below, or they
> could request assistance with other types of natural resource protection projects,

so long as the methods used and cumulative impacts of the projects fall within the
parameters analyzed in this EA.
…
WS-Idaho anticipates becoming involved in IDFG efforts to enhance greater sage-
grouse populations by reducing predation by ravens.

AR 37266-67.  Wildlife Services also plans to continue its current practice of killing predators at

the request of livestock producers, both proactively and reactively.  AR 37266 (Final EA,

describing preferred alternative).  It may conduct these activities anywhere in Idaho if requested,

without any further public analysis or disclosure, and may use any of the methods of predator

control discussed in the Final EA, so long as it determines cumulative effects will not exceed

those the Final EA contemplates.  *See* AR 37266, 37186-202, 37221 (rejecting need for site-

specificity).  There is no description of baseline conditions of specific project areas, including

baseline predator populations.

   Similar to the approach courts rejected in *N. Plains*, *Sierra Club*, and *Rosenkrance*,

Wildlife Services plans to gather information about the effects of these future predator control

activities through conducting the activities.  The Final EA admits:

   Research to precisely define all factors needed to fully understand site-specific
   predator/prey systems is often expensive, complex, and may take years to
   complete….   Consequently, natural resource management agencies often
   implement adaptive management approaches….  This enables the natural resource
   management agency to realize any potential benefits of management actions while
   concurrently obtaining information needed to make improved management
   decisions.

AR 37184 (emphasis added).  It claims Wildlife Services will avoid any adverse cumulative

impacts that could jeopardize viability of wildlife populations through "[c]oordination with

agencies that have management authority for the long-term wellbeing of native wildlife

populations and review of available data on wildlife population size and population trends…."

AR 37238.  This approach improperly allows significant impacts to be identified after they

occur, rather than allowing Wildlife Services to understand the effects of its actions at the outset, as NEPA requires.

In the case of Wildlife Services' proposed sage-grouse predator-killing, where it has received a specific request for assistance from IDFG, the failure to provide an adequate baseline is even more glaring.  AR 37195 (request for sage-grouse predator-killing pending).  Wildlife Services "anticipates receiving requests to provide predation management in a limited number of sage-grouse nesting areas to protect eggs and chicks during the vulnerable nesting and fledging periods (IDFG 2013a)."  AR 37186.   It explains:

> The IDFG has initiated a project to evaluate the effectiveness of raven removal to enhance sage-grouse populations (IDFG 2013a). To date, WS-Idaho has not provided operational assistance with this project. The project would only be conducted in 3 of the 15 sage-grouse management zones in the State, and would only include a portion of the area within the zone - specifically areas that had exhibited sharp sage-grouse declines relative to the statewide trend.

AR37184.  This limited information suggests that Wildlife Services can analyze where and when the project would take place, which predators would be targeted, and provide other baseline environmental information against which Wildlife Services could judge the effects of its activities, but it declined to do so.  Indeed, since IDFG has already begun implementing the project (which failed), Wildlife Services could even anticipate its activities' environmental effects.  AR 32059 (IDFG comments on Draft EA).

Adequate baseline information is critical to discern whether sage-grouse predator-killing is an appropriate management tool.  *See* AR 73884-88 (Braun letter predicting failure of previous proposed sage-grouse predator-killing study); AR 74244 (Wildlife Services must independently evaluate possible effectiveness of proposed raven-killing project).  Science does not support predator control to benefit sage-grouse, except in localized areas where habitat is compromised by local activities.  AR 79417 (IDFG comments recognizing habitat quality and quantity are

primary limiting factors), AR 37187, 37190-91, 37251 (Final EA discussing science).  To the

limited extent Dinkins et al. (2016) found predator control *could* have a place in sage-grouse

management, it concluded:

> [R]aven removal may have a place in sage-grouse management <u>as an interim</u>
> <u>mitigation measure in areas with low sage-grouse nest success when sage-grouse</u>
> <u>populations are subjected to high densities of ravens</u>, but that long-term solutions
> are necessary such as reducing supplemental food sources and perch structures
> used by ravens.

AR 37251 (emphasis added).  Without considering site-specific factors like habitat condition,

raven density, sage-grouse nest success, and project design, it is impossible to discern whether

predator-killing can provide any benefit at all to sage-grouse.  As Wildlife Services' own

employee had remarked in previous comments on a draft analysis considering raven-killing:

> It is not sufficient to say that this is IDFGs project on these terms.  We can say
> that we cannot change the design, but we do have to give a hard look at the
> project.  In this instance, the valid question for WS is whether the project will do
> what it is intended to do (i.e., provide information of sufficient quality to guide
> future management).

AR 74244.  Without more detailed information, the Final EA "cannot provide the basis for an

informed evaluation or a reasoned decision."  *W. N. Carolina All.,* 312 F.Supp.2d at 776-77

(internal quotations and citations omitted).

Accordingly, the Court should hold the Final EA and Decision/FONSI arbitrary and

capricious for failing this "hard look" requirement.

> 2.  *Wildlife Services' Failure to Consider Site-Specific Information Precludes*
> *An Adequate Effects Analysis.*

An agency must fully evaluate the site-specific impacts of a proposed action at the time it

makes the critical decision to act.  *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050-51 (9th

Cir. 2013); *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (discussing timing of site-

specific impacts analysis).  An agency must consider effects specific to a site where predator

control is contemplated. *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, No. 2:05-CV-0299-MCE-PAN, 2006 WL 1991414, at *8-10 (E.D. Cal. July 14, 2006) (EIS was inadequate where it failed to analyze site-specific impacts of gopher baiting). Some quantified information is necessary for an adequate cumulative impacts assessment; "[g]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998); *see also Klamath-Siskiyou Wildlands Ctr.,* 387 F.3d at 995.

Wildlife Services has made the critical decision to act through the Final EA and Decision/FONSI, and therefore must consider its activities in site-specific detail, but it specifically rejects that responsibility. AR 37221, AR 37240-41, 37248-49. Instead, Wildlife Services claims it will independently consider site-specific impacts through the AWP process and by using its "WS Decision Model" analytical thought process in implementing actions, without additional public involvement. AR 37248-49 (Final EA relying on Decision Model and AWPs for site-specific analysis). It rejects the requirement for site-specific analysis, claiming "a more detailed and more site-specific level of analysis would not substantially improve the decision-making process and pursuing a more site-specific and more detailed analysis might even be considered inconsistent with NEPA's emphasis on reducing unnecessary paperwork (Eccleston 1995)." AR 37240-41 *but see* AR 31343 (BLM comments calling this "a stretch of the rationale.").

On the contrary, Wildlife Services can identify site-specific impacts of its proposed activities, and site-specific information is necessary to understand those effects. For example, Wildlife Services can predict locations in which it will conduct "proactive" coyote killing, AR

31078 (Forest Service comment on Draft EA), and indeed it returns to some of those locations several years in a row.  AR 37260 (describing proactive controls), AR 37305 (removals conducted annually).  But the Final EA does not: disclose where these activities are anticipated or for how long; estimate local coyote populations; project how many coyotes may be removed from these areas; or describe how the environmental effects of these activities will be measured. As the Forest Service pointed out, understanding whether these activities may have significant impacts requires "disclosure of effects at a scale below the state-level."  AR 78444.

Without an understanding of how many coyotes inhabit action areas, Wildlife Services risks eradicating or significantly reducing local coyote populations, which may affect the local environment or those coyote populations in ways Wildlife Services has not considered. Eradication of apex predators can change the behavior of prey species, altering plant community composition.  SOF ¶ 13.  Coyotes limit the presence of smaller predators, which may prey more heavily on ground-nesting birds, like sage-grouse, and at least one study showed a decrease in sage-grouse nest success with intensity of coyote removal.  *Id*.  Long-term, intensive coyote removal can result in changes to rodent and rabbit species composition in removal areas.  *Id*. BLM commented that since coyotes can perform as specialist predators in some circumstances, more site-specific analyses of predator removal were necessary.  AR 31341. Gese (2005) found that found reducing coyote populations by 44-61% the first year and 51-75% the second year caused substantial reductions in coyote pack size and density.  SOF ¶ 14.  This in turn caused new coyotes to colonize the control area, along with a shift towards a younger age structure.  *Id*.

Wildlife Services concludes its activities under the proposed alternative will not cause those effects because they result in removal of only a few animals, from limited areas, on a temporary basis, but these assertions are false.  SOF ¶ 15.  Wildlife Services' activities are

particularly concentrated on the Twin Falls and Idaho Falls BLM Districts in southern Idaho, but Wildlife Services only considered three years' worth of AWP summary reports—which included a year of extremely light controls—detailing the extent of coyote control on these Districts. *See* Brooks Decl., Ex. 14.  Wildlife Services and private hunters and trappers combined may have eradicated 83% of the coyote population on the Twin Falls District in 2011, almost 63% in 2013, and 68% in 2014.  SOF ¶ 10.  Wildlife Services' level of take combined with take from other sources is within the range where Gese observed impacts to coyote populations, but Wildlife Services never took a hard look at these potential effects.  SOF ¶ 15.

The Final EA relies on county-level coyote removal data to claim its actions are not impacting the statewide coyote population, but never considers how removal may be impacting coyote populations at the county or regional level.  SOF ¶ 10.  In Washington County, for instance, where Wildlife Services killed 1,462 coyotes between 2010 and 2015, the coyote population estimate (using Wildlife Services' methods) is only 874.[6]  *See* AR 37608.  Similarly, in Twin Falls County, Wildlife Services killed 1,163 coyotes between 2010 and 2015, but the estimated coyote population is only 1,155.  *See id*. And Wildlife Services never considered how private hunting and trapping might interact with its activities on the county level to exacerbate their effects on local coyote populations.  This case is similar to *Sierra Club*, where the agency's assumption that it would not eradicate cougars in the project area was undermined by its failure to understand the number of cougars and how hunting and trapping could combine with its activities to impact the local cougar population.

The Final EA's broad, general discussion is not adequate to analyze cumulative effects under NEPA.  *Neighbors of Cuddy Mountain*, 137 F.3d at 1379; *see also Klamath-Siskiyou*

---

[6] County coyote population estimates are provided by dividing the acreage of the County by 640 to obtain the square mileage and multiplying by 0.6 (coyotes per square mile).

*Wildlands Ctr.*, 387 F.3d at 994-96 (conclusory statements about no effect not sufficient for cumulative effects analysis).  Because Wildlife Services failed to consider site-specific factors, like predator or prey populations in the areas where it intends to conduct work, its cumulative effects analysis is extremely speculative.  NEPA's hard look requires more.

      **D.**      **Failure To Take A Hard Look At Concerns About Effects Raised By Agency Reviewers.**

As noted above, NEPA requires that an agency must discuss "any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised."  40 C.F.R. § 1502.9.

This Court has addressed the need to respond to critical agency feedback before, and was affirmed by the Ninth Circuit.  *W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008) *aff'd in part* 632 F.3d 472 (9th Cir. 2011).  In *Kraayenbrink*, BLM proposed changes to its grazing regulations that numerous agency reviewers commented would have significant environmental effects.  *Id*. at 487-91.  Rather than addressing concerns raised by these experts, however, BLM simply "downplayed" the environmental effects associated with the new regulations.  *Id*. at 492-93.  The court held that where an agency "offers no meaningful response to serious and considered comments by experts, the agency renders the procedural requirement meaningless and the EIS an exercise in form over substance."  *Kraayenbrink*, 632 F.3d at 492-93.  Because BLM had neither considered the comments "objectively and in good faith," nor made responsive changes to the proposed regulations, it failed to take a "hard look."  *Id*. at 493.

Wildlife Services has done the same here by disregarding and failing to meaningfully address the many negative comments and criticisms mounted by other expert federal and state agencies, as well as the extensive science submitted by Plaintiffs and others.  The Final EA failed to grapple with and respond to these comments pointing out its biased and one-sided analysis, its

reliance on outdated studies instead of modern science, and its ingrained preference for lethal

predator killing instead of non-lethal means despite the growing body of experience and science

showing that lethal controls are often ineffective or even counter-productive.  As in

*Kraayenbrink*, Wildlife Services' failure to adequately address and respond to all these criticisms

underscores that it violated the NEPA "hard look" requirement.

In two other examples, the Final EA is also arbitrary and capricious in its treatment of

environmental impacts of lead shots and concerns about the humaneness of its methods, because

it addressed significant agency criticism only superficially, without any changes on the ground.

### 1.  *Use of Lead Shot.*

The Draft EA dismissed the effects of using lead shot to kill coyotes and other predators

on raptors by claiming that it uses only a minute amount of lead in ammunition that is scattered

throughout the environment.  FWS recommended omitting this rationale, suggesting "[i]f this

language is retained, we recommend discussing in detail that lead bullets fragment in shot

animals, that many raptors/eagles can feed off of one single carcass, and that a very, very small

amount of lead (tiny fragment) can kill an eagle."  AR 32075.  It also recommended updating the

outdated literature in the literature review section, and summarized the "bottom lines" in modern

scholarship concerning the effects of lead on eagles:

> 1) lead has been attributed as the cause of death to many scavenging raptors
> (including both species of eagle), 2) substantial amount of exposure and death
> does appear to be coming from spent ammunition, 3) lead exposure is thought to
> be one of the leading anthopogenic [*sic*] causes of death to eagles and other
> scavenging raptors, and 4) lead exposure to non-target wildlife is quite possibly
> one of the riskiest aspects of WS activities to scavengers.

AR 32076.  As a result of these risks, FWS recommended the following measures to minimize

impacts to non-target wildlife:

> 1) A commitment to make every effort practical to recover and/or properly dispose of all animals shot with lead ammunition, regardless of animal size, and, if this is not possible, to use non-toxic ammunition, OR 2) a committment [*sic*] to phase-out the use of any lead ammunition and phase-in the use of non-toxic shot in areas for all WS activities.

AR 32076.

Wildlife Services declined to do any of the things FWS recommended or significantly change its effects analysis.  While it moved the discussion of lead toxicity from "Issues Not Considered in Detail" to the Final EA's section discussing impacts on eagles, it dismissed the risks to eagles using an identical rationale to the one in the Draft EA.  *Compare* AR 30823-28 (Draft EA lead toxicity discussion) *with* AR 37354-55 (Final EA lead toxicity discussion).  This analysis relied on a study by Hayes (1993) that the FWS had criticized as outdated.  AR 30826; AR 32075 (FWS critiquing Draft EA literature); AR 37354 (relying on same).  It did not commit to recover and dispose of animals shot with lead ammunition because it claimed recovering animals shot in aerial operations would be unsafe.  AR 37354.  It refused to use non-toxic ammunition because it claimed non-toxic ammunition did not meet Wildlife Services' safety standards, even though Wildlife Services uses only non-toxic ammunition to shoot birds protected by the Migratory Bird Treaty Act. AR 37375-76.  Nor did it analyze in detail the effects its use of lead shot could have on scavenging raptors; it determined that its use of lead shot could kill "some" eagles, but was not significantly impacting eagle populations.  AR 37355.

 2.  *Humaneness.*

Agency reviewers also expressed concerns about the Draft EA's discussion of humaneness of Wildlife Services' activities.  BLM pointed out that the Schmidt citations, which the Draft EA relied upon to state that humans may have varied feelings about what constitutes an acceptable amount of animal suffering, were badly outdated and the ethical discussion had

changed.  SOF ¶ 29.  Both the Forest Service and IDFG requested a firm commitment to following trap check requirements, because "[i]t has been an issue in the past."  *Id*.  IDFG recommended that pan-tension devices used to avoid trapping non-target wildlife should be described with specificity, "otherwise it'll just (continue to) be ignored."  *Id*.

The Final EA did not adequately address these issues, either.  Wildlife Services added some references to its discussion of humaneness, but continued to rely on the outdated Schmidt citations.  AR 37396-97.  Wildlife Services also refused to make a firm commitment to complying with trap check requirements, instead offering the following response:

> WS-Idaho's use of traps and snares conform to current rules and regulations administered by IDFG. WS-Idaho employees are exempt from State law that requires a person to visit every trap or snare once every seventy-two (72) hours (IDAPA 13.01.16.200.01.b). However, WS-Idaho typically checks traps and snares at 3-4 day intervals, or sooner.

AR 37284.  Since Wildlife Services was already claiming to check traps according to regulation intervals, these assurances do nothing to address the concerns advanced by agency reviewers that Wildlife Services had not checked traps frequently enough in the past and would not do so in the future.  AR 32067.

In other words, Wildlife Services attempted to paper over the flaws its sister agencies had identified without changing anything substantive.  This rendered the EA little more than an exercise in "form over substance," and failed to take the hard look at effects that NEPA requires.

## III.     THE EXPANDED PREDATOR KILLING IS *ULTRA VIRES*.

Claim Three of Plaintiffs' Complaint challenges Wildlife Services' proposed expansion of its Idaho actions include raven poisoning and other wildlife killing to supposedly benefit sage-grouse or other species as violating the agency's statutory authority.  *See* Compl. ¶¶ 130-35. Plaintiffs are entitled to summary judgment on this claim because the agency may only act

within the bounds of the statutory authority, here the Animal Damage Control Act (ADCA), which restricts Wildlife Services to conducting activities regarding "injurious" animal species and it has not established that the predators to be targeted by its expanded activities are injurious.

The ADCA provides:

> The Secretary of Agriculture may conduct a program of wildlife services with respect to <u>injurious animal species</u> and take any action the Secretary considers necessary in conducting the program.

7 U.S.C. § 8351 (emphasis added).  To act within its statutory mandate under the ADCA, Wildlife Services must make a finding that the species intended to be targeted are "injurious." *See Friends of Animals v. Clay*, No. 13-cv-7293(JG), 2014 WL 4966122, at n. 4 (E.D.N.Y. Oct. 3, 2014).  The Court may review Plaintiffs' claim that Wildlife Services acted *ultra vires* in violation of the ADCA under the APA, 5 U.S.C. § 706(2)(C) (providing that reviewing court "shall hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority or limitations, or short of statutory right").

The ADCA does not grant Wildlife Services the authority to expand its program to kill predators of game species across the State of Idaho because Wildlife Services has not established – and it cannot establish – that these predators are "injurious."  The Eastern District of New York considered a similar contention in *Friends of Animals*, 2014 WL 4966122, at n.4.  There, plaintiffs challenged Wildlife Services' proposal to shoot birds at an airport to prevent collisions with airplanes, arguing that without specific information about which bird species would be targeted, Wildlife Services had failed to show the proposed action was within its legal power.  *Id*. The court determined that since the supplemental EIS at issue established that even small birds could present a risk to aircraft and large birds presented a major risk, Wildlife Services had adequately established the bird species in question were injurious.  *Id*.  Thus, the court

recognized that Wildlife Services must establish that species to be targeted are injurious to act within its statutory authority.  *See id*.

Plaintiffs were unable to locate a finding that predators to be targeted to boost game populations were "injurious" in the Final EA.  Nowhere in its discussions of coyote predation does Wildlife Services demonstrate that coyotes are injurious to deer populations—Wildlife Services even agreed with a comment that coyote removal does not benefit deer populations.  AR 37520; *see also* AR 37197.  Yet, Wildlife Services may still kill coyotes to "protect" deer under the selected alternative, if requested to do so by IDFG.  AR 37624 (Describing selected Alternative).

Likewise, Wildlife Service failed to establish that ravens or other predators are injurious to sage-grouse.  *See* AR37186-92.  Indeed it could not without assessing whether predation is limiting sage-grouse populations in light of habitat conditions and other factors, which it does not do.  AR 79417 (IDFG comments), AR 37187, 37190-91, 37251 (Final EA discussing science).

Because Wildlife Services failed to establish the predators it may target to "protect" game species are injurious, and its expanded activities are *ultra vires* and must be reversed.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment, reverse and remand the Final EA and Decision/FONSI and enter appropriate remedial relief as Plaintiffs will seek after the Court rules on the merits of their claims.

Dated: January 26, 2018                    Respectfully submitted,

s/ *Talasi B. Brooks*
Talasi B. Brooks (ISB # 9712)

Attorney for Plaintiffs