Talasi B. Brooks (ISB # 9712)
Laurence J. Lucas (ISB # 4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, Idaho 83701
(208) 342-7024
(208) 342-8286 (fax)
tbrooks@advocateswest.org
llucas@advocateswest.org

Kristin F. Ruether (ISB # 7914)
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise, ID 83701
(208) 440-1930 (phone)
(208) 475-4702 (fax)
kruether@westernwatersheds.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY, WILDEARTH GUARDIANS, and PREDATOR DEFENSE,<br><br>Plaintiffs,<br><br>v.<br><br>USDA WILDLIFE SERVICES,<br><br>Defendant. | No. 1:17-cv-206-BLW<br><br>**PLAINTIFFS' MOTION TO SUPPLEMENT ADMINISTRATIVE RECORD AND SUPPORTING POINTS AND AUTHORITIES** |

Plaintiffs hereby move this Court to supplement the Administrative Record by considering extra-record evidence offered in support of their Motion for Summary Judgment, ECF No. 18. The extra-record materials for which supplementation is sought are attached as Exhibits 1-14 to the accompanying Declaration of Talasi Brooks.

PLAINTIFFS' MOTION TO SUPPLEMENT RECORD—1

**ARGUMENT**

I.  **THE COURT MAY CONSIDER EXTRA-RECORD MATERIALS IN NEPA CASES, WHEN NECESSARY.**

As explained in detail in Plaintiffs' Opening Brief In Support Of Motion For Summary Judgment (Opening SJ Brief), filed herewith, this case challenges the adequacy of Defendant Wildlife Services' November 2016 Final EA and Decision/FONSI for its Idaho predator damage management programs as violating the National Environmental Policy Act (NEPA).

This Court reviews the alleged NEPA violations under the Administrative Procedure Act (APA), which directs reviewing courts to hold unlawful and set aside agency conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2); *Or. Nat'l Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016). The Court's role is to determine whether the agency took the requisite "hard look" that NEPA demands and provided "a reasonably thorough discussion" of the probable, significant environmental consequences of the proposed action.  *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

Of course, judicial review of agency decisions under the APA typically focuses on the administrative record before the agency. *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir.1996).  The Ninth Circuit recognizes exceptions to this general rule, however, (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.  *Id*. at 1450; *see also Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *Animal Defense*

PLAINTIFFS' MOTION TO SUPPLEMENT RECORD—2

*Council v. Hodel,* 840 F.2d 1432, 1436-37 (9th Cir. 1988)*, modified* 867 F.2d 1244 (9th Cir. 1989); *Friends of the Earth v. Hintz,* 800 F.2d 822 (9th Cir. 1986).

Although these factors are narrowly construed and applied, courts within the Ninth Circuit have routinely admitted extra-record evidence in NEPA cases to address claims that the agency failed to consider likely environmental consequences of a proposed action. *E.g., Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520, n.22 (9th Cir. 1992)*; City of Davis v. Coleman*, 521 F.2d 661, 674–75 (9th Cir. 1975)*; NRDC v. Duvall*, 777 F. Supp. 1533, 1534, n.1 (E.D. Cal. 1991) (all allowing new materials to show that the agency failed to consider all relevant factors); *Blue Oceans Preservation Soc'y v. Watkins*, 767 F. Supp. 1518, 1527 (D. Haw. 1991) (accepting affidavits from plaintiffs' experts).

A court may consider extra-record evidence under the relevant factors exception to determine whether the agency failed to consider factors NEPA requires, or whether such factors are relevant background for evaluating the integrity of the agency's analysis. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Svc.*, No. 3:01–CV–00640–SI, 2015 WL 423090, at *4-5 (D. Or. Feb. 2, 2015). As the Second Circuit has noted, "[d]eviation from this "record rule" occurs with more frequency in the review of agency NEPA decisions than in the review of other agency decisions." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997). The Ninth Circuit has similarly held:

> [T]he district court may extend its review beyond the administrative record and permit the introduction of new evidence in NEPA cases where the plaintiff alleges "that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug."

*Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1447 (9th Cir. 1993) (quoting *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1384–85 (2d Cir.1977)). This Court has

likewise applied the relevant factors exception to consider extra-record evidence in NEPA cases. *See e.g., Idaho Conservation League v. U.S. Forest Serv.*, No. 1:11–CV–00341–EJL, 2012 WL 3758161, at *3 (D. Idaho Aug. 29, 2012); Memorandum Decision and Order, *Western Watersheds Project v. U.S. Forest Service*, No. 4:05-cv-189-BLW, 10-11, 26 (D. Idaho. Feb. 7, 2006), ECF No. 47 (denying motion to strike and considering extra-record evidence which came from agency but was not included in Administrative Record).

In addition, a court may take judicial notice of a fact that is not subject to reasonable dispute because it is either generally known in the court's territorial jurisdiction, or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). The Court may thus take judicial notice of agency documents that may not be in the record. *See Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1112, n. 14 (9th Cir. 2010) (taking judicial notice of official Bureau of Land Management (BLM) documents that were not in the administrative record).

## II. THE COURT SHOULD CONSIDER THE EXTRA-RECORD MATERIALS OFFERED HERE.

The Court may consider the materials attached to the Brooks Declaration here under the principles above because they show that Wildlife Services' Final EA failed to consider serious environmental consequences and swept environmental problems under the rug. *Nat'l Audubon Soc'y*, 46 F.3d at 1447. Plaintiffs proposed most of these materials for inclusion in the Administrative Record, but Defendant declined, stating that the agency did not consider them. Brooks Decl., Ex. 13. The materials are critical for the Court's evaluation of the agency's decision and NEPA compliance because they demonstrate that Wildlife Services' analysis made unwarranted assumptions, overlooked information showing that its activities could have

significant effects on the environment, and actually misrepresented important facts, precluding the required hard look.

Specifically, as explained further below, the Final EA purported to consider the impacts of all Wildlife Services' activities on lands under Cooperative Service Agreements, annual work plans (AWPs), or other agreements within Idaho.  AR 37221 (Final EA).  It stated that site-specific analysis and coordination with federal land management agencies would occur through its AWP process.  AR 37248-49 (Final EA discussion of reliance on AWPs for site-specific analysis), AR 37255-56 (Final EA discussion of reliance on AWPs for coordination with federal agencies).  Yet, the Final EA considered only three years' worth of AWPs and summary reports to minimize the effects of its actions, when considering an additional two years' worth of AWPs and summary reports would provide a more complete picture of the extent of the environmental impacts its activities have on the Twin Falls and Idaho Falls Bureau of Land Management (BLM) Districts.  Brooks Decl., Ex. 13 (C. England comm.).  Nor does it provide a map of these or other BLM Districts and U.S. Forest Service units, so the reader can determine where the impacts are concentrated on public lands in Idaho.  And it relied on discredited science to support its key assumption that coyote populations can withstand sustained reductions of as much as 70 percent.  AR 37304, 37308 (citing Connolly and Longhurst (1975)).

A.     **Agency Communications Bearing Upon Accuracy of Assumptions in EA.**

The Exhibits submitted with the Brooks Declaration are important to consider as extra-record materials because they demonstrate that, while the Final EA falsely represented that Wildlife Services relies on its AWP process to ensure its activities comply with federal land management mandates and adapt its activities on the site-specific level, that process does not always occur.

Exhibit 1 is a 2017 email from a Jason Wright, an Idaho Falls District Bureau of Land Management (BLM) employee, to Wildlife Services explaining that his supervisor was concerned that Wildlife Services had not met with BLM since 2014.  In a 2015 communication attached as Exhibit 2, Mr. Wright inquired of Wildlife Services what the difference was between an annual work plan and Wildlife Services' EA, and Wildlife Services referred to the work plan as a "courtesy document" that was not "legally mandated."  In a further communication attached as Exhibit 3 and dated April 3, 2017, Wildlife Services sent Mr. Wright a copy of its 2016 work plan with the Idaho Falls District BLM, because BLM still did not have a copy of that work plan, which had been in effect for the entire previous year.  That communication also shows that, four months into 2017, a new work plan still had not been executed.  These communications are consistent with Exhibits 7 and 8, which show that eight months into 2017, despite two searches in response to Freedom of Information Act requests, the Forest Service Region 4 still did not have copies of its annual work plans with Wildlife Services.

Other communications show that Wildlife Services is not coordinating with land management agencies as it claims to do to ensure compliance with their management mandates.  Exhibit 4 shows that a Forest Service employee on the Idaho Panhandle National Forest feared Wildlife Services was using AWPs as a "check the box" authorization and expressed concern that they should be approved by a Forest Supervisor.  Exhibit 5 is a 2014 communication from Nez Perce-Clearwater National Forest Supervisor Rick Brazell expressing concern that he had not heard about Wildlife Services' wolf control actions on the Forest until after the fact.  Exhibit 6 is a chain of emails in which employees on the Custer and Gallatin National Forests in Montana arranged a special meeting with Wildlife Services to discuss potential control actions in wilderness, informing Wildlife Services that this process was more than a mere "check the box."

These Exhibits show that the Final EA falsely asserted that AWPs are executed by Wildlife Services each year and involve coordination with federal agencies to ensure its predator damage control activities on public lands do not violate federal laws, and those false assertions violate NEPA, as Plaintiffs explain in their Opening Summary Judgment Brief.

**B.    Agency Records Showing Significant Effects Wildlife Services Did Not Consider.**

The Court may also consider Exhibits 9-13 to the Brooks Declaration because they show that Wildlife Services did not consider the impacts of its coyote-killing on lands currently "covered" by AWPs as it claimed to do, and that its coyote-killing in Southern Idaho may have significant environmental consequences that the agency misrepresented or ignored in the Final EA and Decision/FONSI.  The Exhibits demonstrate that, in truth, Wildlife Services has conducted large amounts of coyote-killing—comprising a substantial portion of its statewide coyote-killing—on BLM's Twin Falls and Idaho Falls Districts.

Exhibit 9 is a map of the Twin Falls District made by Ken Cole (former Idaho Director of Plaintiff Western Watersheds Project), with the grazing allotments on the District labeled. Exhibits 10 and 11 consist of Wildlife Services' own AWPs and summary reports.  The summary reports associated with these AWPs show that Wildlife Services killed 1,847 coyotes on the Twin Falls District in 2011 and 720 coyotes on the Idaho Falls District in 2012.  The map from BLM's website attached as Exhibit 12 shows that these two Districts are adjacent to each other.[1] When considered in light of other materials in the Administrative Record documenting the extent of Wildlife Services' coyote-killing, the AWPs show that the coyote-killing Wildlife Services conducts on these two Districts in southern Idaho is typically a substantial proportion of that

---

[1] The Court may also take judicial notice of this map, as it is publicly available on BLM's website and therefore readily ascertainable.

which it does statewide.  The Summary Reports also show the names of grazing allotments on which Wildlife Services has conducted work; when compared with the map attached as Exhibit 9, they show where Wildlife Services' activities are concentrated on the Twin Falls and Idaho Falls Districts.  Comparing the map of the Twin Falls District at AR 39982, with the County-level trapping data in IDFG's Furbearer Report for 2011 (AR 52300-01, 52549-50) allows a rough estimate of how many coyotes, total, were killed on the Twin Falls District in 2011 and what proportion of the population may have been removed.  The communication with Christine England attached as Exhibit 13 shows that Wildlife Services did not consider these materials.

These materials thus show that Wildlife Services' activities may have site-specific significant impacts which it should have considered and disclosed to the public but did not—and thus failed to consider relevant factors under NEPA.

These materials are also important to the Court's consideration of this matter because the three years' worth of AWPs in the Administrative Record paint a misleading picture of the extent of Wildlife Services' coyote killing on the two Districts.  In 2015, Wildlife Services killed only 107 coyotes on the Twin Falls District, and 127 coyotes on the Idaho Falls District—a mere fraction of those killed in previous years.  *Compare* AR 38344, 38308 *with* AR 38331-32, 38295.  The 2015 numbers are not representative of how many coyotes Wildlife Services habitually kills annually on the two Districts.  By failing to consider previous years, Wildlife Services is misrepresenting the facts about its coyote killing and improperly skewing its analysis.

C. **Data Quality Act Challenge Addressing Connolly and Longhurst (1975).**

Finally, the Court may consider Exhibit 14, which is a Data Quality Act challenge to Wildlife Services' reliance on Connolly and Longhurst's 1975 coyote-killing study, because it reflects on the lack of professional and scientific integrity of Wildlife Services' analysis.  The

Final EA cites this antiquated study (AR 37304), which suffers from many flaws set forth in more detail in the Data Quality Act challenge. The Court may consider it to show that the Final EA wrongly assumed that the Idaho coyote population can withstand 60-70 percent removal on an annual basis without negative effects.

In summary, all of these Exhibits submitted with the Brooks Declaration will aid the Court's consideration of the integrity of Wildlife Services' NEPA analysis and decision. Many of the materials were created by Wildlife Services itself, or by its agency partners. Importantly, they undermine key assumptions in Wildlife Services' Final EA, serve as evidence that Wildlife Services' actions may have significant effects on the Twin Falls and Idaho Falls Districts, which it failed to consider, and reflect on the poor quality of the scientific information upon which the Final EA relies. They will aid the Court's assessment of Plaintiffs' claims and the Court should consider them as extra-record evidence under the "relevant factors" exception.

WHEREFORE, Plaintiffs respectfully pray that the Court grant this motion and supplement the Administrative Record to consider the Exhibits submitted with the Brooks Declaration.

Dated: January 26, 2018               Respectfully submitted,

                                      s/ *Talasi B. Brooks*
                                      Talasi B. Brooks (ISB # 9712)

                                      Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

      I hereby certify that on this 26th day of January, 2018, I filed the foregoing PLAINTIFFS' MOTION TO SUPPLEMENT ADMINISTRATIVE RECORD AND SUPPORTING POINTS AND AUTHORITIES and the accompanying DECLARATION OF TALASI B. BROOKS (and all Exhibits thereto) electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Christine G. England
Christine.England@usdoj.gov

Attorney for Defendant

                                             /s/ *Talasi B. Brooks*
                                             Talasi B. Brooks (ISB # 9712)
                                             Attorney for Plaintiffs